J-S08026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| WARREN BYRD | : | |
| | : | |
| Appellant | : | No. 897 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 7, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005748-2024

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JULY 15, 2026**

Warren Byrd appeals from the judgment of sentence imposing one to two years' incarceration after a trial court convicted him of strangling Patricia Smith and related offenses.[1]  Byrd challenges the officer's testimony about statements Ms. Smith made at the scene.  For the reasons below, we affirm.

At 11:10 p.m. on July 1, 2024, Byrd and Ms. Smith were arguing in the middle of a Philadelphia neighborhood.  They created "a big commotion . . . The neighbors were out."  N.T., 3/7/25, at 12.  As Officers Hober and Brown drove their patrol vehicle towards the pair, Byrd had "his hands on [Ms. Smith's] shoulders [and was] shaking her."  *Id.* at 11.  Officer Hober parked, activated the microphone of his body camera, and walked towards the argument.

_____

[1] *See* 18 Pa.C.S.A. §§ 2701(a), 2705, and 2718(a)(1).

Officer Brown "got in the middle [of the pair and] was trying to get [Byrd] off her[.  However, Byrd] pushed off [Ms. Smith] and then started to run."  *Id.* at 29.  The two officers pursued him.  *See* Commonwealth's Ex. 3 at 1:08-10.  They caught Byrd after about a block, a physical tussle ensued, and Officer Hober's body camera fell to the ground.  *See id.* at 1:20-24.

As the police handcuffed Byrd, he repeatedly demanded that she tell them something, but Byrd did not say what he wanted her to tell them.  Ms. Smith repeatedly refused to do so.  *See id.* at 1:25-2:13.

Byrd asked her, "Well, what is the dispute, though?"  *Id.* at 2:14.

"You didn't fucking listen," she said.  *Id.* at 2:15-16.

"Alright.  Come here, baby," Byrd replied.  *Id.* at 2:17-18.

Still in tears, Ms. Smith yelled back at him, "No!" and added, "I told you what was gonna happen."  *Id.* at 2:19-24.

Byrd continually asked Ms. Smith to explain the situation to the police and prevent his arrest.  She refused again and again.  *See id*. at 2:25-2:35.  The officers placed Byrd in the back of their vehicle.  Ms. Smith yelled, "See, I told you!  You should've went the fuck home!"  *Id.* at 2:48-51.

Byrd said he needed his phone.  Ms. Smith retrieved it from where he and the officers scuffled.  *See id.* at 3:00.  She also picked up Officer Hober's body camera.  It recorded her in great distress and sobbing.  *See id.* at 3:07-13.  Through her tears, she said, "I told him to go the fuck home.  Go the fuck home."  *Id.* at 3:14-18.

Next, Ms. Smith's mother approached her and said, "Restraining orders. Go in and get the papers, now." *Id.* at 3:21-25.

Ignoring her mother's suggestion, Ms. Smith handed Byrd's phone to him. An officer then directed her to "Step back, ma'am." *Id.* at 3:34-35. Ms. Smith also gave the body camera back to Officer Hober, and she turned as if to head to her house. *Id.* at 3:36-37.

Clipping his camera back on his uniform, Officer Hober asked her, "Can you stay right here? Thanks." *Id.* at 3:38-39. Ms. Smith turned around and faced him. Officer Hober said, "You called the police. Right?" *Id.* at 3:40-43. Ms. Smith looked dumbfounded and did not answer.

Her mother broke the silence. She said, "I have the papers [for a Protection from Abuse Order ("PFA"),] right here. He hasn't even been served yet." *Id.* at 3:44-48. Ms. Smith's mother related that they attempted to serve the PFA on Byrd, but he refused to accept or to sign for it. *See id.* at 3:50-4:00. Officer Brown reviewed the PFA.

Additional officers arrived. Officer Hober went to meet and update them on the situation. *See id.* at 4:20-5:15. Meanwhile, Officer Brown spoke to Ms. Smith. *See id.* at 5:16-30. Officer Hober was too far away from their conversation for his microphone to record the first portion of it. Soon, he went back toward their conversation, and Ms. Smith said, "Well, basically, I told my mom to call." *Id.* at 5:19-22. She stopped crying and said, "My hair's all messed up." *Id.* at 5:33-34.

Officer Brown turned to the group of police and told them, "She's not hurt.  Figure out about [Byrd]."  *Id.* at 5:41-45.

Ms. Smith said, "No one even look at me, please."  *Id.* at 5:45-47.

Officer Brown replied, "Well, I'm gonna get whatever contact, and then you're gonna tell us what - - what's going on tonight."  *Id.* at 5:52-58.

Ms. Smith said, "Arguing."  *Id.* at 5:59.

"Arguing.  Is there more than arguing?"  *Id.* at 6:01-02.

"Yeah," she grudgingly admitted.  *Id.* at 6:03.

"Okay.  What?"  *Id.* at 6:04.

Ms. Smith said, "I don't know;" looked sheepishly at the police; added, "Everybody's all up in my face;" and chuckled.  *Id.* at 6:05-09.

Officer Hober said, "Well, you called us, and this just happened!" as he pantomimed Byrd holding Ms. Smith's shoulders and shaking her.  *Id.* at 6:10-13.

Raising her voice, she answered, "I understand!  I understand!  I got a restraining order against him!  My mama came up - -"  *Id.* at 6:13.

Officer Hober interrupted her and said, "The call - - The call came out that a PFA was - -"  *Id.* at 6:17-22.

Then, Officer Brown offered, "He was violating it."  *Id.* at 6:23.

"Yeah, yeah - - There was already an order," Ms. Smith said and nodded her head.  *Id.* at 6:22-25

Officer Brown replied, "Yeah, but he wasn't served."  *Id.* at 6:25-26.

"Right," Ms. Smith agreed.  *Id.* at 6:26.

- 4 -

Next, the mother handed documents to Officer Brown and convinced him that they had served the PFA on Byrd, even though Byrd refused to accept the documents. *See id.* at 6:28-38. Meanwhile, Ms. Smith began adjusting her hair and said, "He's not respect'n nothing. I don't mean to be snitch'n, but he's just - -" *Id.* at 6:47-51.

The officers left Ms. Smith and headed to their vehicle where Byrd was in custody. The backup officers indicated that they were ready to depart. *See id.* at 7:30-50. Officer Hober said they could not. He and his partner then contacted headquarters and spent a few minutes researching the PFA on their computer. *See id.* at 7:50-10:30.

Nearly ten minutes after their initial interaction with Byrd and Ms. Smith, Officer Brown concluded, "It's a PFA violation." *Id.* at 10:29-30.

Officer Hober said, "Yeah, I know. But - -" *Id.* at 10:31-32.

"But what? Is she not cooperating?" *Id.* at 10:33-35.

"I don't know," Officer Hober answered. *Id.* at 10:36.

The police huddled behind Officer Hober's vehicle, recapped what they knew thus far, and discussed how to proceed. One of the backup officers said, "She has a cut on her knee, if it helps anything." *Id.* at 11:14-15.

Mother then approached them and said, "Her head has a lump in the back of it. You better take a look." *Id.* at 11:20-24.

Officers Brown and Hober walked with Ms. Smith's mother to where Ms. Smith sat on the steps leading from the sidewalk up to the front yard. Officer

Hober asked, "Alright. Do you need medics?" *Id.* at 11:24-25. She declined aid.

Officer Brown asked, "Can I see the injury?" *Id.* at 11:28.

Simultaneously, Officer Hober told her, "You're going to have to come to Northeast [Police Station] to make a statement, okay?" *Id.* at 11:28-31.

The officers examined the back of Ms. Smith's head, and she asked, "Are you serious?" *Id.* at 11:32-34. She was not crying, but she remained visibly shaken. Ms. Smith's speech was still slurred, and her eyes were watery. She also avoided making eye contact with the officers as much as possible.

"I am very serious, ma'am." *Id.* at 11:34-35. Officer Hober then asked Ms. Smith how she got a cut on her knee.

The mother said, "Trying to get away from [Byrd]." *Id.* at 11:47.

Officer Hober replied, "I need her to tell me." *Id.* at 11:48-49.

"Oh, I'm sorry," the mother apologized. *Id.* at 11:50.

"No, it's okay. I just - - I need her to tell me that." *Id.* at 11:51-53.

Ms. Smith said, "I got boogies in my nose, and I'm a little embarrassed about it." *Id.* at 11:55-57.

"You don't have to be embarrassed at all," Officer Hober said. *Id.* at 11:57-58.

"I know, but I'm not a dirty girl. Umm, da, da, da. So, I don't know. It's some bullshit," Ms. Smith said. *Id.* at 11:59-12:04.

Officer Brown shined his flashlight on the cut and blood on her right knee. He asked, "How did that happen?" *Id.* at 12:05-06.

She said, "Popped up outta nowhere." *Id.* at 12:08-09.

"You don't know how *that* happened?" *Id.* at 12:10-12 (emphasis in officer's voice).

Ms. Smith answered, "No.  He just popped up out of *nowhere*." *Id.* at 12:13-14 (emphasis in Ms. Smith's voice).

Officer Hober asked, "What about your neck?" *Id.* at 12:15-16.

Ms. Smith touched the right side of her neck; she said, "Yeah, he just;" and her words became slurred and incomprehensible.  *Id.* at 12:18-20.

Then, Officer Brown told her, "So, I'm letting you know that, when we came up, he was holding you by the arms.  And you were telling him to leave." *Id.* at 12:21-22.

Ms. Smith agreed, "Yeah, I been telling him to leave, and my mama came and - -" *Id.* at 12:23-28.

Officer Brown talked over her:  "Yeah.  Your neck?  He was holding your neck.  Was he holding your neck?  Cause you have marks on your neck." *Id.* at 12:26-30.

She touched her neck again and muttered, "Yeah, he was.  Yeah." *Id.* at 12:31.  Upon hearing that answer, the officers told Ms. Smith she needed to meet a detective and give a statement.  At 11:32 p.m., Officers Hober and Brown got back into their vehicle and drove Byrd to jail. *See id.* at 20:22.

The case proceeded to a non-jury trial, but Ms. Smith failed to appear to testify on behalf of the Commonwealth.  Officer Hober was the only witness at trial.  The Commonwealth's exhibits included his body-camera video.

- 7 -

During Officer Hober's testimony, the district attorney asked him to "describe what [Ms. Smith], in that moment, . . . look[ed] like?" N.T., 3/7/25, at 15.

He said, "She's crying, she's upset . . . [I]t appeared that they both were out that night, and they both were drinking, very intoxicated. She stated to police that he was strangling her." *Id.*

Defense counsel objected based on "hearsay and the Confrontation Clause." *Id.* at 13. (capitalization added).

The trial court replied that it was "definitely overruling the Confrontation Clause," but it sustained his objection to hearsay. *Id.* (capitalization added).

Still, the court gave the Commonwealth a chance at establishing that an exception to the hearsay rule applied. Officer Hober testified that there was a very short time between when he and Officer Brown arrived and when Byrd attempted to flee. Then, the following discussion occurred:

> Assistant District Attorney: And during that time, eventually Byrd finally takes his hands off [Ms. Smith], and he turns and runs. How much time, from when he removes his hands from her body, how much time passes before she made any statements to you?
>
> The Court: Or she says into the air, what was she saying, if at all?
>
> Officer Hober: I mean, we talked to her after we detained him. Is that what you're saying?
>
> Assistant District Attorney: I'm not directing any kind of answer.
>
> Officer Hober: After we - - so once he takes off running, we chase after him.

- 8 -

Q. Okay. So, you run after him. And then how much time passed before you had him in custody?

A. We had detained him in two to three minutes probably.

Q. Okay, How far distance-wise were you from the location when you first arrived?

A. Down the block, maybe a block.

Q. Okay. And then, so, between when Byrd eventually released this woman, runs maybe a block, right, you detain him, do you bring him back towards the location where you had first arrived?

A. Yes. We had put him in the back of that car.

Q. And at that point, is Ms. Smith still on the scene, or did she leave?

A. Yes, she's still on scene.

Q. Okay. And when you come back, what does she look like? What, physically, does her body look like?

A. She had marks around her neck. Then she had some kind of minor laceration on the head.

Q. What did she sound like?

A. She was upset, crying. Her mom was there, and she was very upset, scared, and frightened.

Q. What makes you say that she was scared and frightened?

A. Her emotions. Just talking, she can't - - she couldn't get her words out from all the crying and stuff.

Q. And when she made a statement to you, was that in response to a question or did she just say something?

A. We asked her what happened.

Assistant District Attorney: Okay, Your Honor, I do believe a foundation has been laid for the excited utterance.

Defense Counsel: If I may object. The factors to consider are the time between the startling event - - declaration, here two to three minutes. Although, this is not a declaration. That is testimony in response to a question. Officer Hober just testified he asked her a question and she responded. Excited utterance is an utterance basically that kind of speaks for itself. If someone runs out the door and says, "He stabbed me," it's not them going to chase him, getting him in custody within two to three minutes, coming back, when he's in the car and things are settled down. Sure, she's upset. At this point, it's a narrative. It's a violation of the hearsay rule, and it's a violation of the Confrontation Clause and what I'm citing to is ***Commonwealth v. Blackwell***, Your Honor, 494 A.2d 426, 431, (Pa. 1985).

The Court: Anything more recent?

Defense Counsel: ***Commonwealth v. Murray*** and ***Keys***. They all kind of reiterate the same four factors you're to consider. The main one being, is it testimonial? Not only is this an analysis under the excited-utterance-hearsay rule, But it's an analysis under the Confrontation Clause whether something is testimonial in nature, whether the officer is asking the individual what happened, and this individual is responding with an answer, that is testimonial and violates the Confrontation Clause. And I don't believe they made out the foundation for the excited utterance based on factors communicated in the case law.

***Id.*** at 14-17 (cleaned up).

The Commonwealth responded to the objection by relying on ***Crawford v. Washington***, 541 U.S. 36 (2004). It contended that the mere fact that a declarant answered an officer's question does not automatically make the answer testimonial in nature. According to the Commonwealth, Ms. Smith's hearsay statement of "I was strangled" was given in response to the officers' inquiry into her safety and whether she needed medical treatment. N.T.,

3/7/25, at 19. In the Commonwealth's view, Ms. Smith's hearsay statement actually meant, "Officer, I'm hurt, I need help." ***Id.***

The trial court then asked for the defense's rebuttal. Defense counsel said:

> I'll quote from another case, ***Commonwealth v. Allshouse***, 36 A.3d 162, 171, (Pa. 2012). It cites the ***Crawford*** decision. "The Crawford Court held that the Confrontation Clause prohibited out-of-court statements by a witness regardless whether if the statement was deemed reliable by the trial court."
>
> The Court: Right. Right.
>
> Defense Counsel: Unless the witness is, one, unavailable or, two, did the defendant have a prior opportunity to cross-examine this witness. This witness is not unavailable - -
>
> The Court: How do you know she's not unavailable?
>
> Defense Counsel: She's not here.
>
> Officer Hober: Well, that doesn't mean she's not unavailable.
>
> Defense Counsel: She's not subject to cross-examination.
>
> Assistant District Attorney: She testified at the preliminary hearing.
>
> The Court: Did you get to cross-examine?
>
> Defense Counsel: Yes, but today at trial - -
>
> Assistant District Attorney: That's not - -
>
> Defense Counsel: Regardless - -
>
> The Court: Give me a moment.
>
> Defense Counsel: It's the time between the exciting event and the utterance.
>
> The Court: Yes, that time seems to be like two or three minutes.

- 11 -

Defense Counsel: Well, based on the charges, we don't know when the alleged strangulation occurred.

The Court: I'm sorry. It's the whole event. The police come upon him shaking her back and forth, so let's be realistic. Okay?

Defense Counsel: We have no idea.

The Court: You're not going to keep arguing about that . . . I'm looking at the cases you have cited.

Defense Counsel: But that case goes into - -

The Court: But this case has to do with statements that are significantly later, right? . . .

Defense Counsel: Yes, Your Honor.

The Court: Okay . . . I have **Commonwealth v. Carmody**, right? And here the complainant literally shows up to the police station and says, "He beat me up." Right? And the Court admitted that, but they didn't admit the written statement. So, it seems to me like - -

Defense Counsel: . . . I'm looking at **Commonwealth v. Keys**, Your Honor, where the facts of the - -

The Court: When is that from?

Defense Counsel: **Key** is from 2003 . . . 814 A.2d 1256 (Pa. Super. 2003). The relevant facts of that case are police arrive at the appellant's house. His wife, the complaining witness in the case, is visibly upset, angry, and, in response to officers questions, she recounts the incident, and 30 minutes have elapsed between - -

The Court: So, it's a longer time than we have here?

Defense Counsel: So, at the end of the startling event, there's a statement of the appellant's wife . . . They ruled that the appellant's wife's statement was not an excited utterance, 30 minutes elapsed between the end of the startling events, and the statement of his wife. It was elicited eight blocks from the scene, and the statement was elicited in response to an officer's question, which I believe that's kind of the key factor here. And the statement was a narrative. It wasn't a single reaction to a single startling

> episode . . . The court described the excited utterance as "the event speaking, not the speaker." Here, by the time Ms. Smith makes the statement, the[ police] already went and got Byrd.

*Id.* at 20-23 (cleaned up).

The trial court overruled Byrd's objection. Officer Hober then testified that, "She stated that they were arguing and there was a physical altercation and that [Byrd] strangled her and hit her on the side of her head." *Id.* at 23.

The trial court proceeded to convict and sentence Byrd as described above. This timely appeal followed.

Byrd raises two issues as follows:

1.  Did not the trial court err and abuse its discretion by improperly allowing the introduction of a hearsay statement of [Ms. Smith] into evidence as an excited utterance . . . ?

2.  Did not the trial court err as a matter of law, abuse its discretion and deny [Byrd] his federal and state constitutional rights to due process and confrontation, where the admission of [Ms. Smith's] hearsay statement denied [Byrd] his fundamental right to cross-examine and confront an accuser against him as those statements were testimonial in nature?

Byrd's Brief at 2-3. We discuss each issue in turn.

First, Byrd claims the trial court abused its discretion by allowing Officer Hober to testify that Ms. Smith said Byrd strangled her. He admits that Officer Hober "said the magic buzzwords for the admission of an excited utterance—that the complainant was crying, that she had a hard time getting her words, that only minutes had passed since the police had arrived on the scene." *Id.*

- 13 -

at 11. In other words, Officer Hober's testimony laid a proper foundation for admission of Ms. Smith's excited utterance. Thus, Byrd admits that, based on the record before the trial court at the time of his objection, it properly applied the excited-utterance exception to the evidence before it, and the court did **not** make a decision that was manifestly unreasonable.

Nevertheless, Byrd advances a novel basis for his objection on appeal. He now asserts, for the first time, that "the officer's body-camera video tells a different story [than Officer Hober]. Six minutes and 21 seconds pass, and [Ms. Smith] never said anything about being strangled." **Id.** "She is clearly intoxicated, but calm, concerned with her appearance, and has spent time with her mother." **Id.**

As our above recitation of the trial transcript reveals, Byrd made none of these arguments to the trial court in the first instance. He even asserts that this Court should perform an original review of the video evidence and substitute the facts we find therein for Officer Hober's foundational testimony. However, his counsel **accepted** Officer Hober's recollection of events that the "declaration, here [occurred within] two to three minutes." N.T., 3/7/25, at 16.

Critically, the Commonwealth used the testimony of Officer Hober to lay its foundation for the excited-utterance exception, not the video evidence. Furthermore, defense counsel neglected to ask the trial court to examine the video **before** ruling on the hearsay objection. The Pennsylvania Rules of Appellate Procedure bar this procedural sleight of hand. Instead, this bait-

and-switch argument by Byrd to contend that the trial court made a factual error by accepting Officer Hober's foundational testimony at face value implicates waiver.

"The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." ***Trigg v. Children's Hosp. of Pittsburgh of UPMC***, 229 A.3d 260, 269 (Pa. 2020).

An issue, argument, or legal theory "not raised in lower courts are waived for purposes of appellate review, and they cannot be raised for the first time on appeal." ***Id.*** (citing Pa.R.A.P. 302(a)). Proper "issue preservation is foundational to proper appellate review." ***In re F.C. III***, 2 A.3d 1201, 1211 (Pa. 2010). "Requiring issues to be properly raised first in the trial court ensures that trial judges have the opportunity to consider a potential appellate issue and correct any error at the first available opportunity." ***Trigg*** at 269.

Here, Byrd makes a fact-intensive argument against the admission of Ms. Smith's hearsay statement on appeal, but he failed to make that fact-intensive argument at the time of his objection at trial. He thereby deprived the trial court of the opportunity to consider all the evidence prior to ruling on his objection and to make a fully informed decision. If Byrd had played the video and shown the trial court that the events of July 1, 2024 were not as Officer Hober remembered them, the court would have had the opportunity to exclude the hearsay statement on that basis and may well have done so. But, because Byrd did not give the trial court that opportunity, we do not know how that court would have ruled in light of the video evidence.

In short, Byrd should have used the video to undermine the foundation that the Commonwealth established for Ms. Smith's hearsay statement during his objection below, rather than for the first time on appeal. *See* Pa.R.A.P. 302(a). We dismiss Byrd's novel basis for his objection and his first appellate issue as waived.

As his second issue, Byrd contends that the trial court violated his right to confront Ms. Smith under the Sixth Amendment to the Constitution of the United States and Article I, § 9 of the Constitution of the Commonwealth of Pennsylvania. Byrd's entire argument focuses upon the question of whether Ms. Smith's hearsay statement was testimonial in nature. *See* Byrd's Brief at 17-22. But he conveniently ignores the fact that he actually cross-examined her at the preliminary hearing.

Initially, we observe that Byrd does not assert heightened protections under the Constitution of Pennsylvania based on ***Commonwealth v. Edmunds***, 586 A.2d 887 (Pa. 1991), and its progeny. Thus, for the purpose of this appeal, we treat his state-constitutional right as coterminous with the protections of the Sixth Amendment of the federal Constitution.

Whether the admission of evidence "violated [Byrd's] rights under the Confrontation Clause is a question of law, for which our standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Yohe***, 79 A.3d 520, 530 (Pa. 2013).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The

Supreme Court of the United States has held that the right declared in the Confrontation Clause is the right to confront a witness for the prosecution at some point during the criminal proceeding, not a right to have all hearsay evidence excluded from a trial. "Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted [] where the declarant is unavailable, and [] where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59; *see Commonwealth v. Wholaver*, 989 A.2d 883, 903 (Pa. 2010) ("[T]he Court's rationale that the preliminary hearing questioning served the function of cross-examination remains persuasive for purposes of evaluating whether *Crawford's* cross-examination requirement has been met.").

Ms. Smith was unavailable to testify at Byrd's non-jury trial, because she failed to appear to testify for the Commonwealth. Also, Byrd had the opportunity to confront Ms. Smith — *i.e.*, to cross-examine her — at the preliminary hearing concerning whether he strangled her. Hence, his right to confront Ms. Smith, as contemplated in the Sixth Amendment, was satisfied, even if her answers to the officers' questions on July 1, 2024 were testimonial in nature, as Byrd contends.

As a result, the trial court properly rejected Byrd's Confrontation Clause objection to the hearsay statement, because he had an opportunity to confront his victim. *See* Trial Court's Opinion, 7/30/25, at 14 (stating that Byrd "was given the opportunity to cross-examine complainant on her statement at the preliminary hearing. Therefore, any assertion by [Byrd] that his right to

confrontation was violated lacks merit."). We agree with the trial court and dismiss his second and final issue as meritless.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/15/2026